UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICKY TYRONE HARRIS, | No. C 04-3350 SI (pr) |
| Plaintiff, | **ORDER DENYING SUMMARY JUDGMENT MOTION** |
| v. | |
| DWIGHT WINSLOW, M.D., Health Care Manager, | |
| Defendant. | |

## INTRODUCTION

Ricky Harris filed this action under 42 U.S.C. § 1983, concerning the medical response to a keloid (i.e., hyperplastic scar tissue) that developed on his scalp after he burned himself. Harris claims that Dr. Dwight Winslow was deliberately indifferent to his serious medical needs. This action is now before the court for consideration of defendant's motion for summary judgment. For the reasons discussed below, defendant's motion will be denied.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

At the relevant time, Ricky Harris was an inmate and Dr. Dwight Winslow was the chief medical officer at Pelican Bay State Prison. There is no evidence that Dr. Winslow actually treated Harris' medical condition. Instead, Dr. Winslow appears to be a defendant because he

was in charge of the prison's medical staff and was a decision-maker on the committee that denied Harris' requests for surgery.

Harris went to the prison's emergency room on May 1, 2000, complaining of facial, neck and scalp pain that resulted when he left a permanent hair solution on his hair too long. Harris was admitted to the prison infirmary several days later for treatment of hair loss and scalp burns. Dr. Allen treated him with a topical medication for second, as possibly third, degree burns on his scalp.

After his scalp healed from the burns, a keloid formed. This action concerns the medical response to the keloid and not to the burn that preceded it.

On November 17, 2000, Dr. Alexander, an assistant clinical professor of dermatology at U.C. Davis, examined Harris. Her examination of Harris' scalp revealed a tender, scaly plaque. She opined that if Harris' condition was felt to be a keloid, then steroid injections may be helpful. She also opined that if there was persistent inflammation, then a biopsy should be performed.

Thereafter, Harris was seen by several different health care providers who monitored his condition. On February 9, 2001, Harris was seen by Dr. Faulstick for a follow-up on the dermatology consultation. Dr. Faulstick determined that Harris appeared to have a keloid scar on the right scalp but had no evidence of an inflammatory reaction. On May 4, 2001, Harris was seen by Dr. Cooper, who assessed the area as a keloid formation and did not believe a biopsy would benefit Harris.[1] On September 10, 2001, Harris was examined by Dr. Polidore, who estimated Harris to have a burn scar about 5 centimeters by 1 centimeter in size. Dr. Polidore advised that Harris would be a candidate for excision if the scar increased in size or began to burn or itch.

---

[1] Defendant's recitation of the rest of Dr. Cooper's evaluation of the case does not make sense. Defendant states that "The prognosis was to maintain vulcation to the area and observe for 2nd degree burn formation." Winslow Decl., ¶ 5(e); Motion, p. 4. The court has checked a medical dictionary, a French-English dictionary, a Spanish-English dictionary, a Latin-English dictionary and the Oxford English Dictionary but cannot find a definition for the word "vulcation" or any form of it. It also makes no sense why a second degree burn would be forming a year after the chemical burning agent had been applied and removed.

2

On January 3, 2003, Harris' case and request for surgical removal of the keloid was brought before the medical authorization review committee, consisting of all physicians at the facility. The committee reviewed the medical records, assessed his case, and recommended that surgery not be performed.

Thereafter, Harris saw health care providers for continuing evaluation and follow-up appointments regarding his condition. On January 23, 2003, Harris was examined by Dr. David, who noted that the keloid was cosmetic at the time. On April 22, 2003, Harris was examined again by Dr. David. Harris told him there had been no change in the size of the keloid, but it had started to itch. Dr. David referred him to minor surgery for consultation and consideration of a steroid injection. On August 27, 2003, Dr. David examined Harris again and noted a slight decrease in the size of the keloid and that Harris requested surgical removal of the keloid.

On September 22, 2003, Harris' case and request for surgical removal of the keloid was again brought before the medical authorization review committee. The committee reviewed the medical records, assessed his case, determined that the keloid was a cosmetic issue, and recommended that surgery not be performed.

Harris was examined again by Dr. David on September 26, 2003 and November 12, 2003. Dr. David observed that the keloid remained stable.

On July 9, 2004, Harris was seen by nurse practitioner Lazore. During that visit, it was noted for the first time that the keloid was very painful at times and that Harris was having trouble sleeping due to the pain.

On July 26, 2004, Harris' case and request for surgical removal of the keloid was again brought before the medical authorization review committee. The committee reviewed the medical records, assessed his case, recommended that surgery not be performed, and recommended that Harris instead should be monitored at the clinic.

On or about October 17, 2004, Dr. Goldenson examined Harris and reviewed his medical records under a procedure established in the Madrid class action that dealt with conditions of confinement at the prison. Soon thereafter, Dr. Winslow consulted with Dr. Goldenson about the treatment plan for Harris. The two doctors agreed that, generally, surgical removal of keloids

3

1 is considered cosmetic and is often not successful. Dr. Winslow stated that there were a number
2 of factors to assess when considering surgery. Here, the factors included the fact that the keloid
3 had become large, was causing Harris discomfort and interfering with his sleep. Dr. Winslow
4 also opined that it was appropriate to monitor Harris' condition and continuously re-evaluate as
5 to when surgical removal of the keloid was appropriate. After consulting with Dr. Goldenson
6 and the medical authorization review committee, Dr. Winslow decided to authorize the surgical
7 removal of the keloid.

8 On November 29, 2004, Harris was seen by Dr. Jaderborg for a surgical evaluation of the
9 keloid. The keloid, which was then 3 centimeters by 5 centimeters in size, was surgically
10 removed on December 17, 2004 at the Sutter Coast Hospital in Crescent City, California. In Dr.
11 Winslow's opinion, Harris' right ear healed quite well and he has not had any further problems.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to Harris' claim occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury

4

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendant's challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendant's qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Harris' complaint is verified and will be considered in opposition to the motion for summary judgment even though he failed to file an opposition to the motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

5

1  from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

## DISCUSSION

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1976). To prove that the response of prison officials to a prisoner's medical needs was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to that need by prison officials. See McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837, 844 (1994). A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); see also Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029 (1996). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Id.

As a threshold matter, the court notes that Dr. Winslow can be held liable for the rejection of Harris' requests for surgery. Dr. Winslow was in charge of the administration of health care by medical doctors and other medical staff at Pelican Bay State Prison. He also apparently was on the medical authorization review committee that considered Harris' requests for surgery because the committee consisted of all physicians at the facility.

The parties do not dispute that Harris had a keloid on his scalp. The issues here are whether there are triable issues of fact that the keloid was a serious medical condition (the objective prong of an Eighth Amendment claim) and that Dr. Winslow was deliberately

6

indifferent to it (the subjective prong).

There is a triable issue of fact that Harris' keloid presented a serious medical need. Although Harris' keloid may have started as a cosmetic issue, it became a more noteworthy problem over time and a reasonable jury could determine that it was a serious medical condition. This case would present an intriguing question of whether there is a right to medical care for a purely cosmetic problem if Harris' keloid didn't evolve into an itchy, painful, and sleep-depriving condition, but it did so evolve. Cf. Brock v. Wright, 315 F.3d 158, 164 n.3 (2d Cir. 2003). By September 2003, Harris was complaining that the keloid was itchy and by July 2004, he was complaining that it was very painful and causing him to lose sleep.

There also is a triable issue of fact as to whether Dr. Winslow exhibited deliberate indifference. Five months after Harris complained to a doctor that the keloid had started itching, Dr. Winslow's committee determined, on September 22, 2003, that the keloid was a cosmetic issue and recommended no surgery or steroid injections. Two weeks after Harris complained to a nurse practitioner that the keloid was very painful at times and that he was having trouble sleeping due to the pain, Dr. Winslow's committee determined, on July 26, 2004, that the keloid was a cosmetic issue and recommended continued monitoring and no surgery. It was only when the Special Master and other people involved with the Madrid class action became involved that surgery was finally approved by Dr. Winslow -- suggesting the possibility that, but for their involvement, the keloid would still be on Harris' scalp today. After consulting with Dr. Goldenson in October 2004, Dr. Winslow decided to authorize the surgical removal of the keloid. He wrote that "[t]here are a number of factors to assess when considering surgery. In the case of Mr. Harris, the keloid had become large, was causing him discomfort, and interfered with his sleep." Winslow Decl., ¶ 5.p. From this, a reasonable jury could infer that his earlier rejection of surgery on July 24, 2004 – when the listed conditions existed – amounted to deliberate indifference. Viewing the evidence in the light most favorable to the non-movant, a reasonable jury also might be able to determine that Dr. Winslow exhibited deliberate indifference in rejecting surgery in September 2003, when the medical records included a notation that Harris had complained that the keloid was itchy. Cf. Brock v. Wright, 315 F.3d

7

at 162-64 (summary judgment should not have been granted on deliberate indifference claim regarding a painful and disfiguring keloid on inmate's face).

Dr. Winslow cannot prevail based on the rule that a mere difference of opinion does not amount to deliberate indifference. On the matters in the record, the court cannot say that as a matter of law, Dr. Winslow's refusal to authorize surgery was a matter of a mere difference of opinion about the proper course of treatment for Harris' keloid. Dr. Winslow's motion for summary judgment on Harris' claim must be denied because there is a triable issue of fact as to whether Dr. Winslow exhibited deliberate indifference to a serious medical need.

The same triable issue of fact requires that the motion for summary judgment on the defense of qualified immunity be denied. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); Saucier v. Katz, 533 U.S. 194, 201 (2001) (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). The prisoner's right to have doctors not be deliberately indifferent to his serious medical needs was clearly established long before Harris' keloid developed in 2000. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Jackson v. McIntosh, 90 F.3d at 332 ("For a right to be clearly established it is not necessary that the very action in question have previously been held unlawful.")

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is DENIED. (Docket # 11.)

Defendant must file an answer to the complaint no later than **June 2, 2006**.

In order to move this case toward resolution, a case management conference will be held at **3:30 p.m. on June 21, 2006**. The conference will be by telephone; defense counsel will initiate the conference call. No later than **June 2, 2006**, each party must file a case management

8

conference statement indicating what discovery remains to be done, the amount of time needed for discovery, whether any further motions will be filed, when he will be ready for trial, and an estimate of the number of days needed for trial. The case management conference statements need not be jointly prepared.

The court is concerned that plaintiff lost interest in pursuing this case now that the keloid has been removed, as is suggested by his failure to file any opposition to the motion for summary judgment. He must take steps to prosecute this action or it will be dismissed for failure to prosecute. Plaintiff is advised specifically that failure to file a case management conference statement will be viewed as a failure to prosecute this action and will result in the dismissal of this action for failure to prosecute. See Fed. R. Civ. P. 41(b).

IT IS SO ORDERED.

Dated:  April 24, 2006

_____
SUSAN ILLSTON
United States District Judge